Good morning, your honors. My name is Richard Kilder. I'm a premier of the Vaccine Center. I'd like to reserve five minutes for a rebuttal. An opposite path in that case. I haven't seen one of those in years. Maybe decades. I don't think an opposite path one was still around. Still around? Well, actually, that's probably why this is an important case for your honor to consider. I think the fundamental problem with the defendants' arguments is that what they did is they conflated the concept of intended institutional operations within the context of OU's exemption with the mission statement or goals of a Nevada agency. Are we really worried about what the specifically standard authority is? Well, I think this will have to be you and me to talk about their goals. It doesn't seem to me that you're even disputing that the defendant qualifies under the first test, nonprofit, eligible institution. All we're talking about is the purchase in question for their own use. Right. And when we're talking about their own use, we're trying to determine what own use means, right? That's correct, Your Honor. And there is no specific legal standard authority for determining the scope of that function, is there? Well, I think that when you're dealing with Abbott Laboratories and Judson County, they do give the parameters. And the crime at Abbott Laboratories is not at all like DeModena. DeModena, sorry. I'll provide it. Oh, I get these wrong every time. I wish if you knew, I could answer your problem, Andre. I mean, in DeModena, we had an HMO. In Abbott, we had a hospital. And they differentiated even between the HMO and the hospital. Right. But I think this distinction is important as they're talking about institutional operation. That's a lot different. And they both are applying the standard from Abbott Laboratories and Jefferson County of what is the institutional operation. And let me give you an example of why that is so significant here. Because what you have here is an expanded attempt to get onus immunity because of a mission statement that says, promotes the health and well-being of Nevada citizens. That's as broad as you can get. And when we're talking about exemptions, that is their duty. Do we look at what health districts generally do, or do we look at this particular Nevada statute and its authorization for this agency? Well, I think that you have to look at the operation. And I think that's the difference that I think is important here. It's not the mission statement. It's the operation. So, for instance, when you're talking about Abbott Laboratories, you're talking about the operation of a hospital, a pharmacy in a hospital. I think your honor is correct that we have to look at the operation of a health district. How does one go about determining that when every state that has health districts seems to approach it quite differently? Well, I think you have to look at what they're actually running here. Because here's the difference. I think that when you look at how exemptions are supposed to be narrowly construed, and you take it on the flip side, so now you're looking at a mission statement, which is as broad as possible. Let me give you an example of what would fit in here. What would fit in here is if the government decided that they want to have their own grocery stores because they believe that it's important to have good food and to get food at a cheaper price. They could wipe out all the supermarkets in the state if they wanted to. I understand your point, and you addressed that in your briefing as well, and I see how Abbott looked at what's the basic institutional function of a hospital, and the Kaiser case looked at HMOs. So how does a court go about looking at what is the basic institutional function of a health district? I think you have to look at factually. And here, the most you can say is that they had a clinic that they would sit on. So you have to look factually at it and apply it. But you don't look at the mission. The mission is something that's totally different. So, for instance, in this situation, when you have the health district actually sending out solicitation letters, commercial solicitation letters, to casinos, to businesses, that takes it far beyond. And I think that what's important is there's a lot of conflicts here as well. Okay. Just a minute. If I look at the Nevada revised statute, 439-3502, it says that the SNHD is authorized to regulate as necessary for the prevention, suppression, and control of any contagious or infectious disease dangerous to the public health. That seems a pretty logical way to draw, if you will, a function. If we were to do that. And then if you go to Clark County, it says, and I read from Clark County Code, the SNHD shall establish and conduct a comprehensive program of health, which shall include the control of communicable diseases, providing the SNHD with the power to take whatever action that is necessary to control the diseases. So it's another part of the institutional function. And if that isn't given, I think we're getting some missioning goals, but even if we use them. This is not a goal. This is a legal authority, and if you will, the SNHD has to establish and conduct it by law. This is not just a big goal out here. This is the state of Nevada and the county of Clark saying this is what you've got to do. Okay. So I'll give you two responses to that. First of all, I think City of Lafayette deals with one aspect of that, which is, I'll quote it very quickly, because what it says essentially is that we're not going to necessarily say that a government agency is the only one capable of accomplishing goals. They say, but the economic choices made by public corporations and the conduct of their business affairs, designed as they are to ensure maximum benefits for the community and constituency, are not inherently more likely to comport with the broader interest of national economic well-being than those of private corporations acting in furtherance of the interests of organizations and the shareholders. So what I think that we have to look at here is, number one, if we go precisely to your argument about, you know, this isn't an argument. It's a question. With Nevada law and Clark County law attached to the question. And what I'm saying is that if you look at, first of all, the question, again, that you're going to have to ask is, is this necessary for the control of communicable diseases? I looked at what you specifically argued. You say they charge a fee to administer the vaccine. That's a big problem for you. Well, it's a cost plus, yes. But the whole process is on a nonprofit basis. They can only spend these resources for public health purposes. So I don't know why the fee is relevant at all. Well, I think that the fee is relevant for the following reason. If the purpose is to maximize the opportunity for people to have vaccines, then this should be a non-cost medicine, which is a non-cost. Oh, yes. All they do is charge exactly what they have to pay and get it done. And if they make anything, it goes back into doing the same thing. But I think the concept that's important here is that they don't, for instance, give the vaccines out to the poor, which would be their charge. They don't do that. They make this a commercial enterprise that's based on a person's ability to pay. I mean, there is no evidence in this record that anybody can get a vaccine if they don't have the money to pay for it. But the other part that's important is that it's for the individual. Oh, that's my point. If this was supposed to be consistent with what you and I were saying about controlling diseases, then they would have been offered these vaccines. Does the government agree to pay? Does the state of Nevada agree to pay? Did the Clark County agree to pay? Because the state of Nevada and Clark County sets up this organization, gives them a job to do, and says do it as little as possible. Don't make any profit and make it happen. And all you're saying is because they don't give it to the poor it doesn't work. Well, who would pay? They have no resources to pay. They're giving it out at as little cost as possible. Well, actually there's no proof of that. Well, I understand, but you say they charge fees. I say to myself, so what? Even if they make any money, it just goes back into reducing the next or the other programs they do. But I think the problem is that what they're doing is they're getting rid of all the doctors in Nevada who get vaccines because they're undercutting all the business. They're going directly to casinos and to the other businesses to get that business from my clients. But the other part I think that's important, for what Geronimo was talking about before, is something that's in the GSK brief on page 23 to 24, because what they say with respect to vaccines that we're talking about here, which is hep A and hep B, that the CDC recommends adults who are not vaccinated children for hep A vaccines put them at greater risk for serious disease. There's no screening for that. What is done here, and this leads us to look at the facts here, what they're doing is they're operating a business. They're not trying to basically solve immunization. There's no fact here that shows that this is set up for the purpose of reducing diseases. This is purely a business enterprise as it is spelled out here, which goes soliciting directly to employers. And I think the problem here, again, is that I was soliciting new customers. I realize you made that argument, but I guess if I read the Nevada law and I read what Clark County has suggested they do, I don't know why they wouldn't have the idea that they're supposed to vaccinate as many people as they can. Driving out doctors to give out vaccines is not exactly advancing that goal. And I think that the problem here is- Driving out doctors to give out the vaccines is definitely something you can talk about. I promise you it's happened. But you've got to say they violated it in order to make that argument. Don't go to the end result. Let's talk about the argument. And what I have to look at to say inside, if they really are doing it and what I have here, which is what I'm trying to put to you, is I have to look at what is in fact their- I don't want to call it mission, but their institutional function. And then after finding the function, then I have to say, does this meet the function or not? Whether it drives out the doctors or not, that's the end result. That has no one thing to do with it. What I'm trying to figure out is, do they meet the function? Because I'd be the first one to say we ought to have competition, but I have to now put this law into effect. And what I'm suggesting here is because all these exemptions have to be narrowly construed, you can't have broad mission statements dictate what the institutional operation is. Because in a mission statement, I'd agree, but it isn't. It's Nevada law, not only saying what they do, but directing them to do it. That's different than a broad goal. But the law does not direct them to enter into a commercial enterprise to solicit the casinos. It does not have the aspect of essentially not directing this to, as the statute talks about, for the poor and the people who don't have very afforded. I'm sorry. Go ahead. Good morning. My name is Steven Kastenberg, and I am arguing on behalf of the defendant, GlaxoSmithKline. And as Mr. Coughlin said, I will take up to 10 minutes to reserve the rest for Mr. Coughlin. The vaccines that are simply, as you know, it's the Southern Nevada Health District, the public health organization created by Nevada statute and Clark County statute, is able to provide vaccines at lower cost, to purchase vaccines from GlaxoSmithKline through a federal program called the Kline Vendor Program, that provides discounts and contracts, other pharmaceutical products, to statutorily identified categories of charitable institutions. Can I ask, how do you see if one determines the basic institutional function of the South District? I think that that is a key specific question, Your Honor. But as Judge Smith found, what I was going to say here is you have the easiest job in the world, because there are statutes and code ordinances that define specifically. And yes, I'm glad that my brother raised the issue of Southern Nevada going off and opening a grocery store or a health food store, because ostensibly there could be activities conducted by Southern Nevada that would stretch the outer bounds of the NPIA and OMIUS and its institutional function. And then you would have a hard question before you, but you don't have that question before you. You have a very specific code, as quoted by Judge Smith, that focuses on preventing communicable diseases and taking what action is necessary to do that. And you have, clear from the academy that Southern Nevada had from its ordinary course business website, identifying that one of the main ways that it does that is it engages in preventative vaccines. And there's been no dispute about the importance of vaccination preventing these very serious communicable diseases. There are only four vaccines that are British in this case, and they treat hepatitis A and B, or they prevent hepatitis A and B, diphtheria, pertussis, and tetanus, all very significant diseases, two of which, hepatitis A and B, are still very substantial health problems in this country. The others, less so because of vaccinations. And with vaccines, vaccines is a unique product. It is not like a prescription drug. First of all, in Nevada you don't need a prescription to get a vaccine. That's why when people go get, for example, their flu vaccine, they go to the right aid or some other pharmacy where they get it elsewhere. They don't necessarily get it from the physician. And it's a one-time event. It is not like a hospital or a healthcare system where you have ongoing treatment. To fulfill the basic institutional mission of preventing these diseases Southern Nevada wants to maximize the vaccination rates. And that, in fact, to have effective healthcare is what you have to do. As from the various documents that we cite, there is something called herd immunity with vaccines. And in essence, to be effective, you have to have high vaccination rates. It's a much more effective public health option. Once you mention that. So of course it goes to the core of Southern Nevada's basic institutional function to vaccine, to prevent these communicable diseases, and to do so by reaching the maximum number of people, not just the poorest in our society. Under Demetrius, it was very clear that healthcare itself is a charitable function. That's what I'm trying to say. Undermined, the underpriced private sector. I don't think they're trying to underpriced or overpriced.  they are charging enough. I thought I was stating a fact. That was not a fact. They charge less. They charge more than doctors. Well, Paul, we always look at the vaccine center and search through charges, and they search. They pay more for, they charge more for these particular vaccines. But as Judge Smith pointed out. I didn't understand your question. Did you understand my question? You were asking whether Southern Nevada charges less than physicians do. For these vaccines. That's what I was asking, which is keep looking for yes or no answer. I'm sorry, Your Honor. I was, what I'm saying is the only thing in the record is what vaccines do. Did you just say yes or no? Yes. Yes. Yes, to the vaccine center, Your Honor. Okay. So, what I asserted at the beginning of this is right there, so that the way they are kind of promoted by the communities, by selling in the market, and undercutting, undersuing private vendors. That's how they're doing it. The entire. It's a fact. You know, one way or the other, it's true or not. Well, to the extent you're ascribing in terms of their pricing, I can't address that, and that's not in the record. I'm sorry, did I say anything about intent? Well, you said they're trying to undercut the market, and that's what I, I'm not saying. No, they're not undercutting the market. They're selling less. The entire purpose of the Nonprofit Institution Act, Your Honor, is to allow charitable institutions to stretch their dollars, to buy at lower cost than for-profit institutions, and to fulfill their basic institutional function. Well, there is a fulfillment in various ways, and one way they can do it is by giving it away to people who can't afford it. I mean, that's one way of fulfilling it. In this case, they have it fulfilled by simply selling it to everybody for less than the private sector can sell it to. And they can do that because they get a special deal that the private sector doesn't get. These are facts, right? That is what the Nonprofit Institution Act allows them to do, Your Honor. Yes. But only as far as it's within their basic institutional function. But only as far as it's within their basic institutional function, just like, presumably the discounted pricing to Kaiser Healthcare, one of the largest businesses in this country, which is a non-profit, also benefited from its purchases under the Nonprofit Institution Act. And presumably they competed with for-profit institutions. Just like the hospital in Abbott was a non-profit hospital, it presumably competed with for-profit hospitals in the region. Competition is not the issue. Charging fees is not the issue. Presumably the hospital. That's the case. I'm not saying the competition is not the issue. That's a whole point of the Justice Department, and it's to protect competition. We are there to apply the statute. Your Honor, if you say, if you're arguing that it's competition, it doesn't matter, it sounds, the Justice Department. Well, Congress is the one that made the determination, Your Honor, by passing the Nonprofit Institution Act, which is a specific exemption from the Robinson Act. Well, it makes that, I'm sorry, it says that, it says it's a specific exemption. Well, Abbott certainly says that, Your Honor. It's a congressional statute. No, Abbott, the way Abbott operated its enterprise, it violates the Office of Government, right? It's not a, it does not state that any charitable, any non-profit is exempt from the Office of Government. It certainly does not say that, Your Honor. It doesn't say that any non-profit, yes, you're correct, Your Honor. But you overstated it, when you said the debt, and I didn't mean to, Your Honor. The statute refers to charitable institutions. That is not the challenge, Your Honor. In fact, the only way you get the exemption is for your own use, right? That is correct, Your Honor, which is. Otherwise, you would be in violation, correct? That is correct. Even though non-profit, even though meeting standard of non-profit at an eligible institution, if it isn't for your own use, you'd be violating the act. That is correct, Your Honor. So we're focusing on own use. Yes, Your Honor. Tell me how it's your own use when you vaccinate foreign travelers. Isn't it a legal requirement to vaccinate foreign travelers? Why isn't it in your functions to do that? There is no evidence in the record that there's a legal requirement to vaccinate foreign travelers, Your Honor. That is a unsupported statement in the reply brief of the vaccine center. In fact, it is incorrect, and if Your Honors want to take public notice of that, they can go to the State Department's website, which identifies that there are certain countries in which there are legal requirements, and many for which there are not. For example, you can travel to China, you can travel to Mexico, you can travel to other countries like all of Western Europe, and there are no legal requirements. There are none cited by the vaccine center, and there's none in the record. That is split among substantiated and incorrect statement by the vaccine center. What about soliciting new customers? Why is that? I mean, that, if we're looking at Abbott, it seems to me that would go, Abbott would tell us soliciting new customers is not within your function. I don't believe there's anything, Your Honor, within Abbott or within P.P.D. that says that Kaiser or that hospital could not advertise. In fact, in order to achieve prevent and communicable diseases, Your Honor, the Southern Nevada Health District wants to have the highest vaccination rate that it can. Clark County happens to have a historically relatively low vaccination rate compared to other parts of the country. In order to achieve herd mentality, to achieve its basic institutional function, it needs to advertise that. Those are muted. Do you want to say a bunch now? Thank you. I guess what people will go to is the casinos. They may, Your Honor. You're down to five minutes. I'm down to five minutes. I'm going to pass my time to Mr. Coffey. All I would say, for one second, on the immunity issue is that, Your Honor, the immunity issue also provides an alternative basis for affirming. I don't know that this report said that there was a requirement of a contract. I don't believe that there is. There was, in fact, in any of any contract. I'm not going to give you extra time. If you're going to take it out, you'll have to continue. So that provides an alternative basis, Your Honor. Thank you. Terry Coffey, on behalf of the Southern Nevada Health District, I'm asking the court today to affirm the ruling below that my judge may and may grant a summary judgment to the health district based upon the own use exemption that you've been discussing.  And that is a core function of the health district amongst the various exemptions. The exemption talks about its own use. Correct. And that's a test. The own use, Your Honor, is where we're obtaining these vaccines. Well, it would be not their own use. It would be an example of something where it wouldn't, under your definition, it wouldn't be their own use. In relation to vaccines, Your Honor, I can't think of one. In fact, that's a question I'd posit to my colleague across the aisle that under their definitions, there would be no set of circumstances in which the... So, Your view is that that is not an obstruction at all? For the own use, it's not an obstruction at all? In fact, before this court, it's not, Your Honor, because... What about if all the gamblers were offered free vaccines? Well, we could offer... Or we could offer the redistricting. Would that fall within the own use? When you say all the gamblers, are you talking about... I'm talking about the ones in Las Vegas. Okay. Then, it is the goal of the health district to immunize as many people as possible, not only for the protection of our own citizens. Someone receiving a vaccine will be that much less likely to transmit disease to a resident of the state. And that goes to your question, Your Honor, is that what about travelers? Well, those travelers are going to jurisdictions or other areas in which it's more likely that they'll be infected by a communicable disease and then bring it back to Southern Nevada. And that is why there is no distinction, as Judge Mahan pointed out, that there is no distinction between who we inoculate or their economic basis or economic means. That's not a task of our own use that my colleague, again, wants to set up. So it's a core function that is, in this case, unlike Abbott and Demodena, that is defined by statute. And we don't need to go into an intensive fact analysis based upon the other statutes. And I would add to that, there is 41A, or I'm sorry, 418160, which provides additional statutory authority that requires the district to abate and do what they can to prevent. It's important to note that unlike Kaiser and Demodena, we are a health district. We are not a medical facility. As I told my colleagues, if you show up with a broken arm, you're going to be turned away. We'll call an ambulance for you, but we don't treat people like a hospital facility does. We establish contexts in which people may come in and receive the vaccinations, and we provide other clinical services on the basis of other immutable diseases. But we do not have an x-ray machine. We do not have... How is that for your own use? How is the treatment of that? Certainly, if you establish a client's life as for its own use. It is our very function to provide the services to the residents of Clark County, which encompasses all of Southern Nevada. Pursuant to the statute, that is our use. Do you fund the clinics? The clinics are funded by property taxes. We have a set mill rate within another part of the statute. And then we're also funded by grants and the fees. Who operates the clinics? The clinic is operated by the Chief of the Board of Health, using the employees of the health district and they're governed by a board encompassing all of the jurisdictions within Southern Nevada. So we're governed by a Chief of the Board of Health who operates and a Chief Health Officer who administers all of these functions. So in response to where I think it's important that we look in Abbott, in which in Abbott the court said clearly that the door sill of the facility is not going to be a defining barrier to what constitutes own use and much has been made about a prior practice of going out into various businesses and providing vaccines. Again, I'd say that that is simply a more effective way to vaccinate as many people as possible, the people on the front lines who are more likely than not going to be exposed to a communicable disease by virtue of an interaction with the public. So while it's not a current practice, it is something that was done in the past. Thank you. I will be very brief, to be honest. First of all, the question was about the pricing. We showed proof the pricing is that the price at which my client gets to get vaccine is substantially higher than the price that it's sold by the health district. I think also with respect to Judge Grace's questions, I think it's important to realize we're talking here about the exemption that has to be narrowly construed, and that's where I think we have to look at the operations and look at that prism. And because of that, when you're talking about things such as soliciting casinos, we have to look at the world of vaccines. There's a group of people who are getting vaccines from doctors.  I don't believe that you can expand the whole concept of this exemption to wipe out one side, and that's just it. The price that the doctors are charging is not in the record, is it? The only thing that's in the record is what you have to pay, and therefore you have to charge vis-à-vis what the public health district does. No, we have the price that the health district is charging. The price that the health district is charging is below. But there's something in there about doctors. Well, no, my client, the vaccine center, are doctors, and they're getting the vaccines at a price that's higher. Because you're talking about doctors in general, and the doctors at the vaccine center is what you're talking about. Correct, and that's really what this anti-trust argument is about, is that they're wiping out doctors, and you can't just say, there's one called the doctors who provide the service, and that's the health district who wants to wipe it all out. And they want to wipe it all out because they are choosing this grand, large mission, and that just can't be consonant with narrowly construed exemptions, and especially when you have the Affirmative Act, which can't be within the operation that was described of soliciting the contracts that were sent out to casinos. And we're not talking about people who can't afford it. As a matter of fact, that's the most glaring thing here, is that if somebody can't afford the vaccine, they don't get it. Because there's no proof here. The proof here is they have to pay. And that makes it a commercial enterprise. Thank you. Thank you.
judges: Kozinski, N.R. Smith, Gleason